IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUDITH A. TOLBERT,

        Plaintiff,

vs.

Case No. 04-1316-JTM

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, as administrator
of Woodmen of the World Employee Disability
Plan,

        Defendant.

**MEMORANDUM AND ORDER**

      This matter comes before the court on the parties' cross-motion for summary judgment (Dkt. Nos. 13, 15). Defendant Hartford Life and Accident Insurance Company (hereafter "Hartford") administered and underwrote the Plan at issue herein. Tolbert filed an application for disability benefits under the Plan, but Hartford denied her application. Tolbert has exhausted her administrative remedies available under the Plan. After reviewing the parties' arguments, the court finds in favor of defendant.

**I. FINDINGS OF FACT**

**A. Plan Guidelines**

      The Hartford Life and Accident Insurance Company administered a long-term disability plan called Woodmen of the World Employee Disability Plan (hereafter the "Plan") adopted by Woodmen of the World Life Society (hereafter "Woodmen"), which covered its employees or affiliate employees. The policy defines who is eligible for coverage in the Schedule of Insurance as

follows:

> All Active Full-time Field Associates who are Field Representatives, Area Managers or State Managers who work actively for Woodmen of the World on a regular basis under a Full-time (alpha) contract as follows:

R. 46.  "Actively at work" is defined in the policy as follows:

> You will be considered to be actively at work with Woodmen on a day which is one of Woodmen's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a full-time basis on that day. You will be deemed to be actively at work on a day which is not one of Woodmen's scheduled work days only if you were actively at work on the preceding scheduled work day.

R. 58.  The policy provided that coverage terminated upon termination of employment:

> **When does your coverage terminate?**
> You will cease to be covered on the earliest to occur of the following dates:
> 1. the date the Group Insurance Policy terminates;
> 2. the date the Group Insurance Policy no longer insures your class;
> 3. the date premium payment is due but not paid by Woodmen;
> 4. the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;
> 5. the date you cease to be an Active Full-time Field Associate in an eligible class including:
>    a) temporary layoff;
>    b) leave of absence; or
>    c) a general work stoppage (including a strike or lockout); or
> 6. the date your Employer ceases to be a Participant Employer, if applicable.

R. 55.  In pertinent part, the policy defined disability with reference to the first 24 months as follows:

> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by: (1) accidental bodily injury; (2) sickness; (3) Mental Illness; (4) Substance Abuse; or (5) pregnancy, from performing one or more of the Essential Duties of Your Occupation and as a result your Current Monthly Earnings are no more than 80% of your Indexed Disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.
>
> Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

R. 59.  The Plan states:

> **Essential Duty** means a duty that:
> 1. is substantial, not incidental;
> 2. is fundamental or inherent to the occupation; and
> 3. can not be reasonably omitted or changed.

R. 20 (emphasis in original).  The Plan also provides:

> **Your Occupation**, if used in this Booklet-certificate, means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

R. 23 (emphasis in original).  The Plan provides for Hartford to have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the group life insurance policy funding the long-term disability plan.

**B. Plaintiff's Application**

Plaintiff Judith Tolbert began employment with Woodmen in May 1996.  According to Hartford's form completed by Woodmen, the "last day employee actually worked" was "September 30, 2002," but she did not work a full day that day.  On that same form, Woodmen indicated that Tolbert quit working on September 30, 2002, because of "fibromyalgia."

James M. McDermott, D.O., Tolbert's treating physician, completed Hartford's form entitled "Attending Physician's Statement of Disability" on which he indicated that Tolbert primarily suffered from fibromyalgia, and secondarily from severe osteopenia and arthritis; and that she first began suffering from these conditions in September 1998.  R. 254.

Plaintiff filed a claim on December 26, 2002, for disability benefits beginning November 20, 2002, claiming a diagnosis of fibromyalgia.  Plaintiff's last day of work before filing for disability was September 30, 2002, but in her application she stated that she was first unable to work as of November 20, 2002.  Plaintiff controverts that the "date [Tolbert] was first unable to work" is a

3

material fact to summary judgment, arguing that under the Plan, the relevant inquiry is when a participant was last "actively at work" as Hartford defined the term. The record also discloses the following telephone conversation as recorded by Hartford:

> Asked about LDW [last date worked]. She said that [September 30, 2002] was actually the last date she went out selling. She had a couple appt's come to her home between that date and 11/20/02 otherwise worked a little from home. She was trying to be honest she said in that the LDW was when she was doing all the duties of her job. She said the last policy she wrote was date prior to db.

R 43. Dr. James McDermott, D.O., plaintiff's primary care physician, completed the Physician's Statement of Disability submitted as part of her claim for benefits, and described her condition as follows:

> **Primary diagnosis** - fibromyalgia ICD -9 Code 729.1
> **Secondary diagnosis** - severe osteopenia - arthritis ICD - 9 Code 733.9
> **Impairment Standing**: no problem;
>> **Walking**: pain in knees and feet when walking, especially after sitting for any period of time;
>> **Sitting**: pain in knees and lower part of legs - pain in lower back after long periods of sitting;
>> **Lifting/carrying**: cannot lift anything over 10 pounds; strain and pain on shoulder area;
>> **Reaching/working overhead**: no problems;
>> **Pushing**: no problems;
>> **Pulling**: pain in upper arms;
>> **Driving:** pain in feet and lower legs, upper and lower back - very limited driving due to pain;
>> **Keyboard use/repetitive hand motion:** stiffness in hands after repetitive hand motion for 15 minutes.
>
> **If any other activities are limited, please specify the activities and limitations**: No comment.
>
> **If the patient's vision is impaired, please describe the extent of the impairment**: Worsening of vision; night vision especially.
>
> **What is the psychiatric impairment (if applicable)?** Essentially good functioning in all areas. Occupationally and socially effective.

R. 237-238. The portion of the form prepared by Dr. McDermott also contained a specific question as to the "[d]ate patient became unable to work due to this impairment?" Dr. McDermott's response was November 20, 2002.

Plaintiff stated in her application that she has severe pain in the "back - shoulders" that she first noticed in 1994. She also stated, in response to a question as to whether her condition caused her to change the way she did her job, that she had to have someone drive for her and carry her computer bag. She stated that the aspect of her condition making her unable to work was "driving - sitting for long periods of time." R. 233.

In response to Hartford's request, Dr. McDermott sent his medical records of plaintiff's office visits for the period June 18, 2002 through December 10, 2002 plus radiology and lab reports for that period. The reasons for her office visits during that period were shown as allergic rhinitis (6/18/02); parasthesia and fibromyalgia (6/24/02); to discuss lab results, pap smear, breast exam, general concerns, past hysterectomy, osteopenia, fibromyalgia (7/02/02); consult about results of Dr. Brown's exam, lupus ruled out, request for hot tub order because it helps her fibromyalgia and osteoarthritis (8/20/02); complaint of lack of sleep; stress (9/06/02); osteopenia, fibromyalgia, osteoarthritis of multiple joints, treatments with acupuncture, and general chiropractic approved, walking and Zoloft prescribed (9/24/02); poison ivy, muscle pain and joint aches, reviewed medications for fibromyalgia and sleep disturbance (10/14/02); poison ivy, fibromyalgia, osteopenia, flu shot (10/21/02); fibromyalgia in exacerbation, osteopenia, osteoarthritis (12/10/02). R. 173-199. Dr. McDermott's office notes do not reflect any work restriction.

Dr. Samuel Brown, a board-certified rheumatologist, sent his notes of plaintiff's office visits on August 7, 2002 and August 16, 2002, and a copy of his consultation report to Dr. McDermott dated August 18, 2002, with the radiology and lab reports attendant thereto. His

impression on August 16, 2002 was:

> A. Osteoarthritis - mild
> B. History of fibromyalgia
> C. Positive ANA through RML, negative ANA profile through Specialty Labs
> D. History of ovarian cancer
> E. Status post-hysterectomy, tonsillectomy
> F. Equivocal history of myocardial infarction and stroke in the distant past

R. 203-212. He recommended a water exercise program and continuing with medication and therapy as prescribed by Dr. McDermott. Dr. Brown's records likewise do not reflect any work restriction.

**C. Hartford's Administrative Review**

Hartford denied plaintiff's application for long-term disability benefits by letter dated March 31, 2003, stating that "the medical information contained in your file does not establish that you met the policy definition of disability when you ceased work on September 30, 2002." It also stated plaintiff was not eligible for benefits after September 30, 2002, because she was no longer actively at work. In the four-page denial letter, Hartford described its interpretation of the applicable policy provisions, the documents on file that were considered, the required ERISA appeal process and the medical reports that were reviewed. The letter stated:

> Medical documentation from your x-rays, MRI, and office examination evaluations with Dr. McDermott for complaints of fibromyalgia does not substantiate that you were prevented from performing your occupation as of October 1, 2002. Dr. McDermott has not provided medical documentation supporting you were unable to perform your own occupation as of October 1, 2002. We have not been provided with medical evidence from any physician to support that you were disabled from performing your occupation beginning October 1, 2002. Therefore, no benefits are payable and your claim is denied.
>
> As you ceased work on September 30, 2002 you ceased to be an Active Full- Time Field Associate in an eligible class as of October 1, 2002. The medical information provided does not support an inability to perform your occupation as of October 1, 2002 and your employer reported that you were not on an approved FMLA leave when you ceased work. As you ceased to be an Active Full-time Field Associate your

>LTD coverage terminated on October 1, 2002. Any disability commencing after that date is not covered under this policy.

R. 166-169. Hartford's analysis on March 26, 2003 states in part:

"There are several references to [Tolbert] being stressed/anxious re issues [with] elderly parents. If she is caring for elderly parents as it appears, this likely entails driving. If she can drive to care for elderly parents, then she is not functionally impaired from driving on the job." . 49. Hartford concluded that "driving is the only essential duty of [Tolbert's] job that appeared impacted by her physical status." R. 48.

According to Hartford, and based on the job requirements received from Tolbert's employer, a field representative for Woodmen has to:

>"sit, stand, walk, drive consantly (sic) 8 hrs per day.
>Lift/carry up to 20 lbs constantly
>push/pull up to 20 lbs constantly
>Handle, finger, feel constantly
>climb, balance, stoop, kneel, crouch, reach all levels occasionally.
>EE [Tolbert] required to carry lap top computer,
>Repetitive use of feet and hands req." (AR 47, top).

In its final denial letter dated October 16, 2003, Hartford stated:

>"Therefore, "Your Occupation" as it is recognized in the general workplace is not necessarily the same as the "job" you performed for Woodmen Of The World at that particular location. To determine the physical demands of Your Occupation as it is recognized in the general workplace, the <u>Dictionary of Occupation (sic) Titles (DOT)</u>, published by the United States Department of Labor is utilized. The DOT lists Your Occupation as light duty and may involve standing or walking for brief periods of time. The list of physical demands show that Your Occupation requires lifting up to twenty pounds and reaching, handling, and fingering.
>
>Your occupation, or job, with Woodmen Of the World is considered "medium" according to DOT standards as it requires more frequent lifting of twenty pounds.
>
>Given the physical demands of "Your Occupation" as recognized in the general workplace in comparison to the restrictions provided by Dr. Wagner of no repetitive flexion, extension, or rotation of the cervical or lumbar spine, it appears you would be capable of performing your occupation." (R. 112, at ¶ 3).

By letter dated June 12, 2003, Dr. McDermott offered the following comments on behalf of the plaintiff:

> To Whom it May Concern:
> Please be advised that this patient has a primary diagnosis of fibromyalgia diagnosed in 9/98. She carries a secondary diagnosis of osteoarthritis and osteopenia. Patient's most recent DEXA scan in 2002 showed a T score of lumbar spine -1.970. Femoral neck -1.830. MRI of her cervical spine on 08/02 showed no disc herniation. Lumbar spine x-ray showed presence of lower lumbar degenerative facet disease.
>
> Patient has been unable to work due to disability beginning 09-30-02.
>
> This patient has chronic pain in her knees and feet when ambulating, especially after sitting for any period of time greater than ten minutes. Patient is unable to lift anything over ten pounds due to strain and pain in her bilateral shoulders. Patient is unable to drive long distances due to pain in the lower back and lower extremities. Patient has stiffness in her hands after 15 minutes of repetitive manual action.
>
> We hope that this information is helpful in regard to this patient and her permanent disability.

R. 165. Although Dr. McDermott opined that the "[p]atient has been unable to work due to disability beginning 09-30-02," he previously identified the date that the plaintiff was unable to work as November 20, 2002. R. 238. By letter dated July 9, 2003, defendant acknowledged receipt of Dr. McDermott's letter and again gave instructions to the plaintiff for initiating an appeal of Hartford's denial of benefits.

By letter dated July 14, 2003, plaintiff appealed Hartford's decision and described her then current physical condition, stating further documentation had been and would be provided by Dr. McDermott for consideration on appeal. The appeal letter included a reference to and description of incidents occurring in May and June of 2003. By letter dated August 5, 2003, Hartford acknowledged plaintiff's written appeal.

By letter dated August 13, 2003, Hartford requested additional medical records documenting additional treatment mentioned by plaintiff in her letter of July 14, 2003. By letter

dated September 8, 2003, plaintiff forwarded the additional records.

All medical records previously considered and the additional medical records were sent by Hartford for review to University Disability Consortium, Newton Highlands, MA on September 17, 2003. Dr. Andrea Wagner, board-certified in physical medicine and rehabilitation, was assigned to conduct the review. Dr. Wagner reviewed the medical records and obtained a telephone interview with Dr. McDermott. Dr. Wagner summarized her conversation with him by letter directed to Dr. McDermott on September 30, 2003. The letter included the following statement: Concerning objective findings, you reported on physical examination she had no objective findings. By his signature at the end of the letter written by Dr. Wagner, Dr. McDermott acknowledged the accuracy of Dr. Wagner's summary of their telephone conversation. Dr. Wagner's report to Hartford noted the following:

> The medical record documents evidence of cervical disc disease. The evidence consists of x-ray findings of degenerative disc disease as well as degenerative disc space changes noted on an MRI of the cervical spine. As Ms. Tolbert has an element of degenerative disc disease, it would be recommended that she not constantly and repetitively flex, extend, or rotate her cervical spine. There is no evidence of neurological deficit on physical examination. The radiological findings were mild. There is no indication that the diagnosis of cervical disc/spine disease should significantly impact Ms. Tolbert's functionality.
> The medical record also contains objective evidence supporting a diagnosis of lumbar degenerative disease. This consists of x-ray findings. There is no evidence that the lumbar degenerative disease is significant enough to impact on Ms. Tolbert's functionality. Ms. Tolbert again does not have any evidence of neurological deficit or impairment regarding her diagnosis of lumbar degenerative disease. As Ms. Tolbert does have lumbar degenerative disease, it would be recommended that she not repetitively flex, extend, or rotate her lumbar spine.
>
> The record also includes a report of a DEXA scan indicating that Ms. Tolbert has osteopenia. However, this diagnosis should not impact Ms. Tolbert's functionality. The record states Ms. Tolbert is obtaining appropriate pharmacological treatment. Such treatment is solely preventative in nature.
>
> The medical record refers to a diagnosis of fibromyalgia. A telemedicine consultation describes tender points. Dr. Brown, the attending rheumatologist,

describes a history of fibromyalgia, but again does not document multiple tender points, but refers to a history of fibromyalgia symptoms in the course of his evaluation.

Ms. Tolbert may indeed have fibromyalgia. However, a diagnosis of fibromyalgia does not preclude full-time sedentary to light functionality. There is no evidence that Ms. Tolbert has any significant medical condition or impairment that would impact her functionality. The reported spasms are based on Ms. Tolbert's own report. There are no significant findings noted on any examination documented in the record.

Dr. Wagner further noted:

Ms. Tolbert's diagnosis of osteoarthritis is referred to in the record as mild. There is no condition that is severe in nature documented in the record. The most significant factor is Ms. Tolbert's widespread subjective complaints. These may be due to fibromyalgia. However, the underlying medical condition most responsible for Ms. Tolbert's subjective complaints is not entirely clear based on the record.

The record refers to issues of stress. The record refers to the fact that Ms. Tolbert was referred to a mental health counselor. Psychosocial issues may be playing a role in Ms. Tolbert's subjective complaints and functional difficulties.

There is no condition or impairment noted in the record that would interfere with Ms. Tolbert's ability to use her upper extremities.

The record notes that Ms. Tolbert has been instructed to engage in an exercise program including water therapy and a walking program. This would imply a degree of functionality.

There is no evidence of any condition or impairment that is disabling Ms. Tolbert from performing a sedentary to light duty occupation.

There is no evidence of any condition or impairment that would preclude Ms. Tolbert from sitting, standing, and walking. As she does have subject pain complaints, it would be recommended that she have the ability to change posture when needed.

Dr. McDermott, in the course of our conversation, indicated that Ms. Tolbert had fibromyalgia. Dr. McDermott was not able to provide any objective physical findings.

Dr. McDermott indicated that it was Ms. Tolbert's subjective pain complaints that principally affected her functionality. Dr. McDermott believes that [there] are no psychosocial issues impacting Ms. Tolbert's functionality. Dr. McDermott did express the view that an effective treatment plan had been difficult to implement. Dr.

>McDermott stated that Ms. Tolbert's principal limitations were connected to her subjective pain complaints. There is no objective evidence of any condition or impairment that would preclude full-time sedentary to light functionality. Dr. McDermott was not able to cite any condition or impairment that would preclude full-time sedentary to light functioning or the use of Ms. Talbot's [sic] upper extremities.

R. 119-120. Dr. Wagner's report concluded:

>. . . From all the medical information it is not clear what is disabling Ms. Tolbert from performing a sedentary to light duty occupation. Her subjective complaints appear far in excess of what is supported by objective evidence within the medical file. . . .Based on all the available medical evidence Ms. Tolbert is functional on a full-time basis at a sedentary to light level with the restrictions of no constant repetitive flexion, extension, or rotation of the cervical or lumbar spine and the ability to change posture when needed as of September 2002. There are no other limitations or restrictions supported by the medical evidence.

R. 120. By letter to the plaintiff dated October 16, 2003, Hartford reaffirmed its denial of her claim for long-term disability benefits. The denial letter referenced the opinions of Dr. Wagner and concluded as follows:

>At this point, it is necessary to refer to the Woodmen Of The World LTD Policy and the provision pertaining to the definition of your occupation, as evidenced on page 19 of the booklet and defined below:
>
>>**Your Occupation**, if used in this Booklet-certificate, means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.
>
>Therefore, "Your Occupation" as it is recognized in the general workplace is not necessarily the same as the "job" you performed for Woodmen Of The World at that particular location. To determine the physical demands of Your Occupation as it is recognized in the general workplace, the Dictionary of Occupation Titles (DOT), published by the United States Department of Labor is utilized. The DOT lists Your Occupation as light duty and may involve standing or walking for brief periods of time. The list of physical demands show that Your Occupation requires lifting up to twenty pounds and reaching, handling, and fingering.
>
>Your occupation, or job, with Woodmen Of the World is considered "medium" according to DOT standards as it requires more frequent lifting of twenty pounds.

> Given the physical demands of "Your Occupation" as recognized in the general workplace in comparison to the restrictions provided by Dr. Wagner of no repetitive flexion, extension, or rotation of the cervical or lumbar spine, it appears you would be capable of performing your occupation.
>
> More importantly, your last day worked is shown to be September 30, 2002, and your next office visit on record is that of October 21, 2002, at which time you were treated for poison ivy. Therefore, we have no evidence of disability as of October 1, 2002. Prior records document no significant change in your condition to explain for disability as of October 1, 2002.
>
> Despite later indicating a disability date of September 30, 2002, Dr. McDermott previously noted that November 20, 2002, was the first day you became unable to work. Dr. McDermott did not treat you on September 30, 2002, and therefore it is unclear how he can make that assessment.
>
> Additionally, in your letter of appeal, you indicate a claim filing date of December 2002, two months after your coverage ceased under this policy. As stated previously, you no longer have coverage under this policy when you cease to be an "Active Full-time Field Associate", and therefore, coverage ceased as of October 1, 2002.
>
> Based on the contractual provisions of the Woodmen Of The World Long Term Disability, the Independent Physician Review of your records, and conversations with your physician, we find no evidence to support Disability from your own occupation. Additionally, your coverage ceased as of October 1, 2002, and any disabilities occurring after said date cannot be considered.
>
> This determination as described in the above analysis represents our final decision on this claim.

R. 94.

## D. Claim of Mental Impairments

Hartford representatives made the following notations on February 28, 2003:

> "[A]nxiety/situational stress re caring for her parents 1st reported 9/6/02 at which time [Tolbert] was Rxed Elavil/ref to counseling.
> [A]nxiety/situational stress re caring for her parents 1st reported 9/6/02.
> [C]ounseling starting on 10/2 and meds.
> On 9/6, she reported sleep disturbance which was attributed to situational stress. Elavil was Rxed. She was set up for her 1st counseling appt. on 10/2. On 9/24, she was was (sic) reporting … a lot of anxiety/stress related to her partents (sic). . . .
> [C]ounseling starting on 10/2 and meds.
> She was set up for her 1st counseling appt on 10/2.
> Elavil was discontinued as it was too sedating and she was started on Zoloft."

R. 44, 45.

Hartford's internal notes on March 14, 2003, asked themselves "whether counseling is helping w [Tolbert's] depression/stress mgmt." R. 47.

A record made following a meeting of Hartford representatives on March 26, 2003, includes the following:

> She was seen on 9/6 w c/o lack of sleep. She noted she was under a lot of stress. AP [Attending Physician] Rxed Elavil. She was advised to consult w social services concerning her stress level surrounding her parents. When seen on 9/24, EE [Tolbert] admitted to a lot of ongoing anxiety and stress related to her parents. . . . She had an appt for a mental health consultation.
>
> There are several references to EE [Tolbert] being stressed/anxious re: issues with elderly parents. If she is caring for elderly parents as it appears, this likely entails driving. If she can drive to care for elderly parents, then she is not functionally impaired from driving on the job.

R. 49. On August 13, 2003, an appeal specialist with Hartford recorded, "A: In a few OV's psych is mentioned, though the claimant does not provide the name\003 of a physician/therapist." R. 52.

> "Disability" under the Plan includes mental impairments as follows:
> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
>     1. accidental bodily injury;
>     2. sickness;
>     3. Mental Illness;
>     4. Substance Abuse; or
>     5. pregnancy,
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

R. 20 (original emphasis).

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### III. ANALYSIS

In defendant's motion, Hartford argues that Ms. Tolbert was last employed as a full-time associate on September 30, 2002, and that she only claimed disability on November 20, 2002. Because plaintiff's disability did not manifest until after she terminated employment with Woodmen, Hartford determined that Ms. Tolbert was not entitled to benefits under the Plan. Plaintiff responds that she stopped working on September 30, 2002 because of fibromyalgia and that her treating

doctor noted her disability began on September 30, 2002. Plaintiff believes the relevant date on the issue of coverage is April 8, 2003, the last date Ms. Tolbert was employed under contract with Woodmen. Hartford balks that this information was not in the original administrative record and should not be considered.

In plaintiff's motion, Ms. Tolbert argues that Hartford operates with an inherent conflict. In issuing a denial, plaintiff argues that: 1) Hartford used the DOT definition of "light work," even though the Plan did not state the DOT definitions as the applicable standard, and then misapplied the definition; 2) Hartford was unreasonable in denying Tolbert benefits based on a lack of objective findings; 3) Hartford was unreasonable in making a final determination with Ms. Tolbert's psychological records; and 4) Hartford unreasonably disputed the onset date of disability. Defendant controverts these assertions.

In <u>Fought v. Unum Life Insurance Co. of America</u>, 379 F.3d 997, 1004 (10th Cir. 2004) (per curiam), the Tenth Circuit addressed the question of "<u>how much</u> less deference ought a reviewing court afford" under the sliding scale analysis. "When the plan administrator operates under ... an inherent conflict of interest, .... the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." <u>Id.</u> at 1006.

For inherent conflict of interest cases, the Tenth Circuit evaluates specific obligations of both the plan administrator and the court. First, the plan administrator must demonstrate: 1) that its interpretation of the terms of the plan is reasonable; and 2) that its application of those terms to the claimant is supported by substantial evidence. <u>Fought</u>, 379 F.3d at 1008. Second, the court must take a "hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by

the conflict of interest." Id.  In adopting this burden-shifting standard, the court explicitly rejected the application of Kimber in cases of inherent conflict of interest. Id.  However, the standard in Kimber remains available where a plaintiff cannot establish a serious conflict of interest.  See Fought 379 F.3d at 1005.

The issue before this court is whether Ms. Tolbert's termination of employment on September 30, 2002, ends her claim of disability benefits.  Since there is an inherent conflict, the court uses the approach announced in Fought.  Even though the court applies less deference, the court finds defendant Hartford's reading of the Plan terms reasonable and untainted by the conflict.  Accordingly, the court finds in favor of defendant Hartford.

Plaintiff focuses the court's attention on the terms "actively at work" and "to work actively." The Plan defines actively at work separately from active full-time field associate.  It states:

> **Actively at Work**
> You will be considered to be actively at work with Woodmen on a day which is one of Woodmen's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a Full-time basis on that day. You will be deemed to be actively at work on a day which is not one of your Woodmen's scheduled work days only if you were actively at work on the preceding scheduled work day.
>
> **Active Full-time Field Associate** means any of Woodmen's Full-time field representatives, area managers and state managers so long as such Field Associate continues to work actively for Woodmen on a regular basis under a full-time (Alpha) Contract. (AR 19)(original bold)(underlining added).

Plaintiff certainly presents a plausible interpretation of Plan terms.  The existence of a full-time contract provides a basis for Ms. Tolbert to be considered an active full-time field associate.  The problem with this argument is that it was not raised before the plan administrator or in the pretrial order.  Thus, the court's analysis of this matter is limited.  Since the issue was not in the administrative record, this court should consider evidence presented to the administrator. Sandoval

16

v. Aetna Life and Casulty Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992) (noting that a "district court generally may consider only the arguments and evidence before the administrator at the time it made the decision."). Even if the court were to consider the argument, it is not clear why "under a full-time contract" should be given more weight than other phrases in the definition.

The central problem in plaintiff's appeal is the lack of evidence supporting a finding of disability. Noticeably missing from the record is evidence of disability prior to or leading up to September 30, 2002. Although Ms. Tolbert had a history of fibromyalgia since 1998, there is no indication that this posed an objective limitation to her ability to work when she decided to leave her employment. She did not seek medical attention nor did her treating physician indicate that she should cease work on or around September 30, 2002. It was only in retrospective analysis that her treating physician attached significance to the date. Ms. Tolbert did not provide evidence that she sought care until November, when she was treated for poison ivy. Additionally, plaintiff stipulated that she ceased working in September 2002. Thus, she could not be at work actively for Woodmen on a regular basis under a full-time contract. With no objective medical evidence indicating disability as of September 30, 2002, the court finds that Hartford could reasonably conclude that plaintiff was not disabled when she ceased full-time employment.

Although the court's determination eliminates the need to address several of the arguments in plaintiff's motion, a few issues remain. For completeness, the court will address the issue of the DOT definition and Ms. Tolbert's psychological record.

Plaintiff objects to Hartford's determination that plaintiff is capable of doing "light" work. Specifically, plaintiff notes that the Plan does not define "general workplace" and that the DOT will be used in determining a person's job. This district has previously addressed similar arguments in Panther v. Synthes, 371 F. Supp.2d 1267, 1276-77 (D. Kan 2005). In Panther, the plaintiff argued

17

that there was no way for the insured to know that the DOT would be used in defining her occupation. The court held that even though the DOT was not specifically cited, the use of DOT was not contrary to the plan language. Panther v. Synthes, 371 F. Supp. 2d at 1279 (D. Kan. 2005). See also Richards v. Hartford Life & Accident Ins. Co., 356 F. Supp .2d 1278, 1287 (S.D. Fla. 2004) (citations omitted) ("When the term 'occupation' is undefined, courts properly defer to the Department of Labor's Dictionary of Occupational Title's ... definition of the term because insurers issuing disability policies 'cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation.' "). Here also, the court finds that defendant's use of "general workplace" and application of DOT comports with the plan language. There is no requirement that Hartford specify that it will use DOT. See Jones v. Kodak Medical Assistance Plan, 169 F.3d 1287 (10th Cir. 1999) (noting that ERISA does not necessitate that a summary description contain particularized criteria for determining medical necessity).

Furthermore, plaintiff's focus on the distinction between light work requiring significant walking and standing or a good deal of walking or standing misses the central issue of whether there was objective medical evidence of disability. There is no evidence in the record that plaintiff suffered medical limitations at the time she ceased work. The record indicates that her physician encouraged walking as part of a regular exercise regime and that walking a mile or two a day could help avert more problems. The recommendation and encouragement to engage in physical activities indicate a degree of functionality. Even if the DOT guidelines included a range of activity not perfectly aligned with Ms. Tolbert's conditions, the medical evidence indicates that plaintiff was capable of more activity than her subjective complaints indicate.

Finally, plaintiff argues that Hartford was unreasonable in making a final determination

without Tolbert's psychological records.  This is not a completely accurate assessment. The record includes reference to Tolbert's anxiety and stress. It notes that Ms. Tolbert had been recommended mental health counseling and treatment with Zoloft. Dr. Wagner specifically noted that psychosocial issues may be playing a role in Ms. Tolbert's subjective complaints and functional abilities. Although plaintiff argues that the evidence was readily available to the defendant, this is not the same as saying that this necessitated a finding of disability.  Without contemporaneous, objective medical evidence indicating disability, the court will not disturb the administrator's findings.

IT IS ACCORDINGLY ORDERED this 27th day of March 2006, that the court denies plaintiff's motion for summary judgment (Dkt. No. 15) and grants defendant's motion for summary judgment (Dkt. No. 13).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE